IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

JAMES C. MCNEILL,           )
                            )
       Plaintiff,           )
                            )
v.                          )      1:17CV924
                            )
KATY POOLE, et al.,         )
                            )
       Defendants.          )

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This matter comes before the Court upon Defendants Patricia Anderson, William Bullard, Shannon Maples, Katy Poole and George S. Warren's ("Defendants") motion for summary judgment. (Docket Entry 81.) Plaintiff James C. McNeill filed a response (Docket Entry 86) and thereafter Defendants filed a reply. (Docket Entry 87.) For the following reasons, the undersigned recommends that Defendants' motion be granted, and Plaintiff's Complaint be dismissed with prejudice.

## BACKGROUND

Plaintiff, a *pro se* prisoner previously housed at Scotland Correctional Institution ("Scotland"), filed the instant Complaint pursuant to 42 U.S.C. § 1983 alleging constitutional violations against Defendants stemming from several incidents occurring at Scotland.[1] (*See*

---

[1] Several other named Defendants have been dismissed without prejudice from this action. (*See* Docket Entry 60.)

1

*generally* Complaint, Docket Entry 1.)[2] In his Complaint, Plaintiff first asserts that Defendants: suppressed and refused to respond to his grievances regarding a sexual harassment complaint he made against a prison official, Officer Kenneth Chavis. (*Id.* at 6-9.) More specifically, Plaintiff alleges that Officer Chavis, on numerous occasions, grabbed his private area and yelled sexual gestures towards Plaintiff while other prison guards observed with laughter. (*Id.* at 6-7.) After Defendant Maples refused to process several of Plaintiff's grievances concerning the sexual harassment, Plaintiff submitted a grievance to Defendant Poole which was also ignored. (*Id.*) Plaintiff also submitted the grievances to Defendant Bullard and others, but they were never processed. (*Id.* at 8.) In all, a total of nine grievances were submitted between May 2016 and January 2017, none of which were processed. (*Id.*) Plaintiff was continuously harassed and physically assaulted for maintaining his sexual harassment complaints against Officer Chavis. (*Id.* at 13-16.)

Plaintiff next asserts that Defendants improperly charged and disciplined him for assaulting another inmate after being told by Defendant Warren that there would be "no write-up." (*Id.* at 9-11.) Plaintiff states that Defendant Warren verbally encouraged and incited inmates to assault another inmate. (*Id.* at 9-10.) A few days later, Plaintiff assaulted the targeted inmate while the individual was walking back from the shower area. (*Id.* at 10.) Approximately one week later, Plaintiff was charged with assaulting an inmate and was informed that a disciplinary hearing would be held regarding the incident. (*Id.*) Plaintiff states that he never received a written copy of the disciplinary charges prior to his hearing, thus his

---

[2] All citations in this recommendation to documents filed with the Court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

2

due process rights were violated. (*Id.* at 10.) On the date the disciplinary hearing was held, Plaintiff states that someone had placed a copy of the charges underneath his cell door while he was at the hearing. (*Id.* at 11.)

Plaintiff next asserts that Defendant Warren "illegally dry celled" him after another inmate near Plaintiff went on a hunger strike. (*Id.*) As a result, the water was turned off in the cell and Plaintiff fell ill after smelling feces in the toilet. (*Id.*) Again, Plaintiff asserts that his due process rights were violated. (*Id.*)

Lastly, Plaintiff claims that prison officials consistently interfered with his mail. (*Id.* at 12-13, 19-20.) More specifically, Plaintiff alleges that he was falsely accused of refusing his legal mail, that prison officials improperly returned his outgoing legal mail, and that he has numerous boxes of legal mail that is misplaced. (*Id.*) Plaintiff further states his outgoing mail has repeatedly been opened without justification and other mail was misdelivered. (*Id.* at 20.)[3]

## DISCUSSION

Summary judgment is appropriate when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Zahodnick v. Int'l Bus. Machs. Corp.*, 135 F.3d 911, 913 (4th Cir. 1997). The party seeking summary judgment bears the initial burden of coming forward and demonstrating the absence of a genuine issue of material fact. *Temkin v. Frederick County Comm'rs*, 945 F.2d 716, 718 (4th Cir. 1991) (citing *Celotex v. Catrett*, 477 U.S. 317, 322 (1986)). Once the moving party has met its

---

[3] Plaintiff also asserts claims of deliberate indifference to a serious medical need against Defendant Dr. Locklear-Jones. (*See* Compl. at 17-19.) Dr. Locklear-Jones has been dismissed from this action without prejudice. (*See* Docket Entry 60.) The undersigned need not discuss these claims in the recommendation herein.

3

burden, the non-moving party must then affirmatively demonstrate that there is a genuine issue of material fact which requires trial. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a fact finder to return a verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Sylvia Dev. Corp. v. Calvert County, Md.*, 48 F.3d 810, 817 (4th Cir. 1995). Thus, the moving party can bear his burden either by presenting affirmative evidence or by demonstrating that the non-moving party's evidence is insufficient to establish his claim. *Celotex*, 477 U.S. at 331 (Brennan, J., dissenting).

When making the summary judgment determination, the Court must view the evidence, and all justifiable inferences from the evidence, in the light most favorable to the non-moving party. *Zahodnick*, 135 F.3d at 913; *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 196 (4th Cir. 1997). However, the party opposing summary judgment may not rest on mere allegations or denials, and the court need not consider "unsupported assertions" or "self-serving opinions without objective corroboration." *Anderson*, 477 U.S. at 248-49; *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996).

In support of their motion, Defendants Poole, Maples, Warren, and Anderson have submitted affidavits addressing Plaintiff's allegations. (*See* Katy Poole Aff., Docket Entry 83-1; Shannon Maples Aff., Docket Entry 83-7; George Warren Aff., Docket Entry 83-8; Patricia Anderson Aff., Docket Entry 83-13.) At the outset, the evidence reveals that during Plaintiff's last five years of incarceration, he has committed approximately 200 infractions, many of which involve false allegations against staff and assaultive conduct. (Poole Aff. ¶ 5; *see also*

Inmate McNeill's Infraction History, Docket Entry 83-3.)  As a result, Plaintiff was frequently housed at the Maximum Control custody level in the M-Con Unit.  (Poole Aff. ¶ 5.)

Inmates in the M-Con Unit are housed 23 hours per day in a single occupancy cell because of the imminent danger they pose to other inmates and prison staff.  (Maples Aff. ¶ 5.)  The inmates assigned to the M-Con Unit are placed there for disciplinary purposes or due to their ongoing behavioral problems, which warrants long-term restrictive housing.  (*Id.*)  Plaintiff was assigned to this unit because of his repeated violations of prison policies governing offender conduct and behavior resulting in numerous infractions at that time.  (*Id.* ¶ 6.)

Concerning the allegations of sexual harassment, Defendant Poole states that complaints of Plaintiff being sexually harassed by Correctional Officer Chavis on or about May 4, 2016 was investigated appropriately and was not ignored.  (Poole Aff. ¶ 9; *see also* May 4, 2016 Incident Report, Docket Entry 84.)   Plaintiff's complaints were reported to multiple prison officials and Officer Chavis was ordered to be separated from Plaintiff as of May 4, 2016 until further notice.  (Poole Aff. ¶ 9; May 4, 2016 Incident Report at 19, 37.)  The harassment complaint was turned over to the Prison Rape Elimination Act ("PREA") staff for further investigation.  (Poole Aff. ¶ 9; May 4, 2016 Incident Report at 18-19.)  Around that same time, Plaintiff's mother also reported the sexual harassment complaints to Defendant Poole.  (Poole Aff. ¶ 9; May 4, 2016 Incident Report at 2.)  She relayed that information to PREA staff as well as Plaintiff's two additional letters addressing the same allegations.  (Poole Aff. ¶ 9; May 4, 2016 Incident Report at 19, 22-23.)

After a thorough investigation, it was determined that Plaintiff's sexual harassment claims could not be substantiated because Plaintiff refused to cooperate with the investigation, and the allegation was determined not to be a form of sexual abuse or harassment under prison policy. (May 4, 2016 Incident Report at 2-3.) Although Plaintiff contends that his sexual harassment grievances were ignored, Defendant Poole states that she is unaware and has no record of several documents attached to Plaintiff's Complaint. (Poole Aff. ¶ 11.) Defendant Poole states that there is no record of these additional grievances dated August 1, 2016, September 6, 2016, and November 22, 2016. (*Id.*) And even if there were, Defendant Poole contends that such grievances would be rejected as the matter was already being investigated. (*Id.*)

With respect to the April 22, 2016 assault by Plaintiff upon another inmate, Defendant Warren avers that he never made a statement to anyone that they should assault another inmate, nor made a statement that such person would not be disciplined. (Warren Aff. ¶ 7.) Defendant Warren states that if any officer were to encourage or incite such behavior, they would be investigated and terminated by the prison system. (*Id.* ¶ 8.) Defendant Warren further states that rather than being encouraged to do so, Plaintiff on that day tampered with the cell door lock and exited his cell without permission. (*Id.* ¶ 9.) Plaintiff then attacked another inmate who was handcuffed and being escorted back from the shower area. (*Id.*; *see also* April 22, 2016 Disciplinary Report, Docket Entry 83-9.) According to the report, Plaintiff was informed of the charges and his rights surrounding this incident, but he refused to sign for the documentation. (Disciplinary Report at 4, 22.)

6

Plaintiff also makes allegations surrounding "dry cell" procedures. (*See* Compl. at 11.) "Dry cell" is a term for the prison's Close Observation Procedure ("COP") of placing an inmate within an empty cell, removing all clothing, except boxers or other suitable clothing, and shutting off the water line to the sink and/or toilet in the cell. (Warren Aff. ¶ 12; *see also* COP §§ .3103(c), (s)(1).) The dry cell procedures are implemented when an inmate is suspected of ingesting or concealing contraband in a body cavity. COP § .3101. Dry cell procedures are maintained 24 hours a day by at least one staff member until an inmate has voided the contraband or until sufficient time has elapsed to preclude the possibility that the inmate is concealing contraband. *Id.* § .3103(e). A daily log must be used during implementation of dry cell procedures. *Id.* § .3103(q).

Defendant Warren states that he did not order the use of dry cell procedures on Plaintiff, nor was he authorized to do so. (Warren Aff. ¶¶ 11, 13; Poole Aff. ¶ 14.) Defendant Warren also reviewed the prison's daily custody reports and was unaware of any documentation demonstrating the use of dry cell procedures on Plaintiff. (Warren Aff. ¶ 14; *see also* Daily Custody Observations Report, Docket Entry 83-10.) In fact, during the time of the alleged use of dry cell procedures on Plaintiff, he was housed in the M-Con Unit, which is not a location where dry cell procedures are executed. (Warren Aff. ¶¶ 15-16.) Defendant Poole states that prison staff were unable to locate any documents purportedly submitted on August 10, 2016, concerning Plaintiff's involvement with dry cell procedures. (Poole Aff. ¶ 14.) As Facility Head, she is the only person that can authorize such procedures. (*Id.*)

Defendants have also submitted evidence concerning Plaintiff's claims of mail interreference. Defendants submitted a copy of Plaintiff's November 14, 2016 letter to

7

Defendant Anderson regarding his claim that his mail was misdirected. (November 14, 2016 Letter, Docket Entry 83-6.) During this time, Scotland did have two inmates named "James McNeill." (Poole Aff. ¶ 16.) Defendant Anderson states that mail is occasionally sent to the wrong housing unit, but this is not done intentionally to harm anyone. (Anderson Aff. ¶ 8.) She also states that she never intentionally redirected Plaintiff's mail. (*Id.* ¶ 9.) Defendant Anderson did recall a time when Plaintiff received a large amount of legal mail. (*Id.* ¶ 6.) She never refused to send out Plaintiff's mail unless there was reason to do so under prison policy. (*Id.* ¶ 10.)

Defendant Warren also states that any allegation that he refused to provide Plaintiff with his legal mail is false. (Warren Aff. ¶ 17.) When Plaintiff receives legal mail, he must sign for it. (*Id.* ¶ 18; Inmate Use of Mail Policy, Docket Entry 83-11.) On or about December 30, 2016, Defendant Warren delivered mail to Plaintiff's cell, but he refused to sign for it. (Warren Aff. ¶ 19; *see also* December 30, 2016 Incoming Legal Mail Log, Docket Entry 83-12.) As a result, it was returned back to the mailroom staff. (Warren Aff. ¶ 19.) Defendant Warren does not recall making any statement to Plaintiff that Defendant Anderson would need to contact the Superintendent about Plaintiff's legal mail. (*Id.* ¶ 20.)

1. <u>Exhaustion of Administrative Remedies</u>

Defendants first argue that Plaintiff has failed to exhaust his administrative remedies regarding the clams alleged in his Complaint. (Docket Entry 82 at 5-8.) The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), requires inmates to properly exhaust administrative remedies before filing civil actions challenging the conditions of their confinement. *See Woodford v. Ngo*, 548 U.S. 81, 84 (2006); *Moore v. Bennette*, 517 F.3d 717, 725

(4th Cir. 2008). The exhaustion requirement applies "to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). It is well-settled that Section 1997e's exhaustion requirement is mandatory. *See Jones v. Bock*, 549 U.S. 199, 211 (2007); *see also Woodford*, 548 U.S. at 90-91 (stating that the PLRA requires "proper exhaustion," which "demands compliance with an agency's deadlines and other critical procedural rules"); *Anderson*, 407 F.3d at 676-77 (citing *Porter*, 534 U.S. at 524).

The North Carolina Department of Public Safety's ("NCDPS") three-step Administrative Remedy Procedure ("ARP") governs the filing of grievances in each of its correctional facilities.[4] *See, e.g.*, *Moore*, 517 F.3d at 721. The ARP first encourages inmates to attempt informal communication with responsible officials at the facility where the problem arose. ARP § .0301(a). If informal resolution is unsuccessful, the ARP provides that "any aggrieved inmate may submit a written grievance . . . ." *Id.* § .0310(a)(1). An inmate may only submit a new grievance after a pending grievance has completed step two. *Id.* § .0304(b). If the inmate is not satisfied with the decision reached at the above-described step one of the grievance process, he or she may request relief from the facility head. *Id.* § .0310(b)(1). If the inmate is not satisfied with the decision reached at the above-described step two of the grievance process, he or she may appeal to the Secretary of Public Safety ("SPS") through the Inmate Grievance Examiner ("IGE"). *Id.* § .0310(c)(1). The decision by the IGE or a

---

[4] *See* N.C. Gen. Stat. §§ 148-118.1 *et seq.*; N.C. Dep't Pub. Safety, Policy and Procedure Manual, Ch. G, §§ .0300 *et seq.*, *available at* https://files.nc.gov/ncdps/div/Prisons/Policy_Procedure_Manual/G.0300_08_01_13.pdf (last visited July 6, 2020). The Court takes judicial notice of this established procedure of the NCDPS as a matter of public record. Fed. R. Evid. 201(1).

9

modification by the SPS shall constitute the final step of the Administrative Remedy Procedure. *Id.* § .0310(c)(6). "North Carolina prisoners can satisfy the exhaustion requirement by completing all three steps of the inmate grievance process, which culminates in the rendering of a decision upon the prisoner's appeal by the North Carolina Inmate Grievance Resolution Board." *Harris v. Midford*, No. 1:10-cv-263-RJC, 2011 WL 1601446, at *2 (W.D.N.C. Apr. 27, 2011) (unpublished).

Plaintiff admits in his Complaint that he did not exhaust his administrative remedies for all of his grievances prior to filing this action. (Compl. at 21.) Plaintiff argues that Defendants' actions hindered him from completing the grievance process. (*Id.*) While "an administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it[,]" *Moore*, 517 F.3d at 725, such is not the case here. First, contrary to Plaintiff's allegations, Defendants did not ignore Plaintiff's sexual harassment claims stemming from the alleged May 4, 2016 incident as evidenced by the thorough investigation. Second, many of Plaintiff's grievances attached to his Complaint bear no indication that it was received by prison officials. (*See* Docket Entry 1-1 at 1, 2, 3, 5, 9, 11, 14, 16, 18, 23.) Defendant Poole attests that the prison has no record of many of these grievances. (Poole Aff. ¶¶ 11, 13, 14.) If any of them were indeed ignored, Plaintiff is still able to complete the remaining steps of the ARP. ARP § .0307(f)(5). Thus, to such extent, the allegations in Plaintiff's Complaint associated with any grievance in which the ARP was

10

incomplete is not properly before the Court.[5] And even if Plaintiff properly exhausted his administrative remedies, his claims still fail for the reasons discussed below.

2. Failure to Investigate Grievances

Defendants argue that Plaintiff cannot maintain a claim based on their failure to investigate his grievances. (Docket Entry 82 at 8-10.) The Court agrees. Claims pursuant to §1983 require "a plaintiff to allege facts indicating the deprivation of federal rights by one acting under color of law." *McMillan v. Vaught*, No. 1:19-CV-591, 2019 WL 8223613, at *3 (E.D. Va. Sept. 10, 2019) (unpublished) (citation omitted). "[T]he Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989). Thus, there is "no fundamental right to a grievance system nor is there a fundamental right requiring prison administrators investigate prisoner complaints." *Mitchell v. Murray*, 856 F. Supp. 289, 294 (E.D. Va. 1994).

Here, as to Plaintiff's claim that Defendants failed to investigate his prison complaints, there is no constitutional right to such investigation. Thus, this claim should be dismissed. *See Boose v. Adkins*, No. 3:18-CV-01480, 2020 WL 3086885, at *20 (S.D.W. Va. May 20, 2020) (unpublished) (Plaintiff "has no federal or constitutional right to a particular type of

---

[5] Defendant Poole concedes that Plaintiff's January 8, 2017 grievance concerning access to medication was exhausted, however it was exhausted after the filing of the Complaint. (Poole Aff. ¶ 12; *see also* Inmate's January 8, 2017 Grievance, Docket Entry 83-4.) Additionally, this grievance concerns Defendant Locklear-Jones who has already been dismissed from this action. Likewise, Plaintiff's January 30, 2017 grievance would not have been exhausted prior to the filing of the Complaint in this action.

11

investigation or investigatory practice."), *report and recommendation adopted*, No. CV 3:18-1480, 2020 WL 3078333 (S.D.W. Va. June 10, 2020) (unpublished); *Jones v. Ervin*, No. 2:19-CV-385-RMG, 2019 WL 2241860, at *2 (D.S.C. May 24, 2019) (unpublished) (allegations that defendants "ignored [plaintiff] and failed to investigate [his retaliation claim], do not make out a § 1983 claim"); *Battle v. N. Carolina Dep't of Pub. Safety*, No. 1:17-CV-174-FDW, 2018 WL 4620619, at *8 (W.D.N.C. Sept. 26, 2018) (unpublished) ("Because there is no constitutional right to an investigation, Plaintiff has failed to state a claim for § 1983 relief against these Defendants for failure to investigate, and this claim will be dismissed.").

3. <u>Plaintiff's Due Process Claim For His Assault On Another Inmate</u>

Plaintiff also claims a violation of his due process rights when he was improperly charged and disciplined him for assaulting another inmate. (Compl. at 9-11.) Plaintiff states that he never received a copy of the disciplinary charges. (*Id.* at 10.) At the outset, the Court notes that Plaintiff admits he did in fact assault another inmate on April 22, 2016. (*Id.*) He was found guilty of the assault and it was upheld on appeal. (*See* Docket Entry 83-9.) Absent a showing that the disciplinary conviction was overturned, Plaintiff's claim is not cognizable under § 1983. *Dilworth v. Corpening*, 613 F. App'x 275 (4th Cir. 2015).

Beyond that, Plaintiff cannot establish a violation of due process law through the manner in which Defendants handled his proceedings. With regard to the proceedings, generally a prisoner is only entitled to "(1) advance written notice of the disciplinary charges; (2) an opportunity, when consistent with institutional safety and correctional goals, to call witnesses and present documentary evidence in his defense; and (3) a written statement by the factfinder of the evidence relied on and the reasons for the disciplinary action." *Stafford v.*

*Henderson*, No. 1:16CV419, 2016 WL 4507359, at *2 (M.D.N.C. Aug. 26, 2016) (internal citation and quotations omitted). Contrary to Plaintiff's allegations that he was not made aware of the disciplinary proceedings, the record reflects that he refused to sign for the paperwork. (*See* April 22, 2016 Disciplinary Report, Docket Entry 83-9 at 22.)

Nor can Plaintiff establish a significant hardship imposed in relation to his ordinary prison conditions. "To state a procedural due process violation, a plaintiff must (1) identify a protected liberty or property interest and (2) demonstrate deprivation of that interest without due process of law." *Prieto v. Clarke*, 780 F.3d 245, 248 (4th Cir. 2015). A prisoner "may have a state-created liberty interest in certain prison confinement conditions," *id.*, however, to give rise to due process protection, "the denial of such an interest [must] impose[] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 249. Here, Plaintiff's ordinary incidents of prison life involved being housed on the M-Con Unit, (*see* Warren Aff. ¶¶ 5-6), thus more time in the segregation unit, lost credit time, lost use of radio, lost leisure time, and lost other privileges, would not have created a significant hardship.

Moreover, Plaintiff presents no evidence that Defendant Warren encouraged him to attack another inmate. Defendant Warren denies such claim, and Defendant Poole contends that Defendant Warren never made such assertions to her. (*Id.* ¶ 7; Poole Aff. ¶ 15.) Plaintiff insists that other inmates witnessed Defendant Warren make the statement (Compl. at 10), however Plaintiff has no inmate statements to support his claim. For all these reasons, this claim should be dismissed.

13

4. <u>Dry Cell Procedures</u>

Plaintiff's Complaint also asserts that Defendant Warren "illegally dry celled" him after another inmate near Plaintiff went on a hunger strike. (Compl. at 11.) However, Defendants' evidence reveals otherwise. Defendant Warren did not, nor had the authority to, order Plaintiff to be subject to dry cell procedures. (Warren Aff. ¶¶ 11, 13.) Moreover, the record demonstrates that Plaintiff was housed in the M-Con Unit, which is not an area of the prison in which dry cell procedures are conducted. (*Id.* ¶ 16.) Because Plaintiff fails to show a violation of his rights to humane conditions of confinement, this claim too fails.

5. <u>Mail Interference</u>

Next, Defendants move to dismiss Plaintiff's claims of mail interference. (Docket Entry 82 at 15-19.) Inmates have a constitutional right to send and receive mail. *See Barnes v. Wilson*, 110 F. Supp. 3d 624, 632 (D. Md. 2015). "However, prison officials may adopt regulations that impinge on an inmate's constitutional rights if those regulations are reasonably related to legitimate penological interests." *Lloyd v. MacNeish*, No. 5:12-CT-3163-FL, 2015 WL 1391476, at *10 (E.D.N.C. Mar. 25, 2015) (unpublished) (internal citation and quotations omitted). "To state a cognizable claim of claim of mail interference under § 1983, there must be an interference with the prisoner's incoming or outgoing mail." *Williams v. Huffman*, No. CIVA 7:09CV00222, 2009 WL 3367062, at *1 (W.D. Va. Oct. 16, 2009), *aff'd*, 371 F. App'x 438 (4th Cir. 2010). In some instances, deliberate interference with a prisoner's mail may rise to a constitutional violation, however negligent interference nor "occasional incidents of delay or non-delivery of mail do not rise to a constitutional level." *Pearson v. Simms*, 345 F. Supp. 2d 515, 519-20 (D. Md. 2003) (citation omitted), *aff'd*, 88 F. App'x 639 (4th Cir. 2004). *See also*

14

*Buie v. Jones*, 717 F.2d 925, 926 (4th Cir. 1983) ("a few isolated instances of plaintiff's [legal] mail being opened out of his presence" that were "either accidental or the result of unauthorized subordinate conduct . . . were not of constitutional mandate."). With regard to legal mail, an inmate "must show actual injury or that a defendant's conduct hindered his efforts to pursue a legal claim" in order to state a claim for denial of access to the courts. *Lloyd v. MacNeish*, No. 5:12-CT-3163-FL, 2015 WL 1391476, at *10 (E.D.N.C. Mar. 25, 2015) (unpublished) (citation omitted).

Here, concerning his non-legal mail, Plaintiff claims that mailroom staff sent his mail to another inmate and he never received his magazines. (Compl. at 20.) Defendants state that there was another individual named James McNeill housed at the prison at the time Plaintiff was there. (Poole Aff. ¶ 16.) Moreover, Defendant Anderson states that she never intentionally misdirected the mail of any inmate, including Plaintiff, and if any mailroom staff had occasionally done so, it was by mistake. (Anderson Aff. ¶¶ 8, 9.) There is no evidence of a pattern or practice of mail interference. *See Tompkins v. Herron*, No. 1:10-CV-978, 2012 WL 1077793, at *3 (M.D.N.C. Mar. 30, 2012) (plaintiff must demonstrate that defendant "engaged in a pattern or practice to interfere with his mail"), *aff'd*, 490 F. App'x 568 (4th Cir. 2012). Simply put, Plaintiff presents no evidence that interference with his non-legal mail rises to a constitutional violation.

To the extent Plaintiff contends that Defendant Warren refused to provide him with his legal mail on or about December 30, 2016, the evidence suggests otherwise. Defendant Warren and another prison staff member did deliver mail to the M-Con Unit where Plaintiff was housed on December 30, 2016. (Warren Aff. ¶ 19.) When he brought legal mail to

15

Plaintiff's cell he refused to sign for it. (*Id.*) Pursuant to prison policy, Plaintiff's refusal was witnessed and recorded by Defendant Warren and the other staff member. (*Id.* ¶¶ 18-19; *see also* December 30, 2016 Incoming Legal Mail Log, Docket Entry 83-12; Inmate Use of Mail Policy, Docket Entry 83-11.) When an inmate refuses to accept his legal mail, it is returned to the sender. (Warren Aff. ¶ 20.) Defendant Warren does not recall referring to Defendant Anderson regarding Plaintiff's mail. (*Id.*) This evidence fails to show any viable mail interference claim.

Plaintiff also states that Defendant Anderson improperly returned several of his mailings to him for lack of postage although he was indigent. (Compl. at 19-20.) Again, he provides nothing further to substantiate this claim. Prison policy does authorize the prison to pay postage for legal mail when an inmate is indigent. (Inmate Use of Mail Policy at 3.) Defendant Anderson states that she never refused to send out Plaintiff or any inmate's mail unless there was a reason to do so that was justified by prison policy. (Anderson Aff. ¶ 10.) Again, as the evidence does not demonstrate that Defendant Anderson intentionally interfered with Plaintiff's legal mail, his claim fails.

Moreover, Plaintiff cannot point to any evidence of an actual injury. Plaintiff must show actual injury or that Defendants' conduct hindered his efforts to pursue a legal claim. *See Michau v. Charleston Cty, S.C.*, 434 F.3d 725, 728 (4th Cir. 2006). Indeed, there is "no evidence that adverse action was taken in any of plaintiff's [legal] cases due to activity that can be tied to a failure to properly process plaintiff's mail." *Wesley v. Green*, No. CIV.A. JKB-11-2363, 2012 WL 1067853, at *4 (D. Md. Mar. 27, 2012). As such, his claim fails.

16

6. Qualified Immunity

Defendants also contend that they are entitled to qualified immunity.[6] (Docket Entry 82 at 19-20.) Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 306 (4th Cir. 2006) ("Qualified immunity shields government officials performing discretionary functions from personal-capacity liability for civil damages under § 1983[.]"). Thus, the traditional two-step qualified immunity inquiry requires a court to determine: "(1) whether the official violated a constitutional right; and if so, (2) whether the right was 'clearly established' at the time of its violation." *Rock for Life-UMBC v. Hrabowski*, 411 Fed. App'x 541, 547 (4th Cir. 2010) (citation omitted). In evaluating qualified immunity, a court initially may determine whether the plaintiff has alleged or shown a violation of a constitutional right at all. *See Pearson v. Callahan*, 555 U.S. 223 (2009).[7]

---

[6] Defendants also move to have this action dismissed against Assistant Superintendent Bullard as Plaintiff has failed to assert any claim against him. (Docket Entry 82 at 19.) Defendants are correct that it appears Plaintiff references a *correctional officer* "Bullard" in his Complaint. (*See* Compl. at 19.) However, a liberal reading of the Complaint also reveals that Plaintiff may be attempting to associate Assistant Superintendent Bullard with his claim that prison officials refused to address his sexual harassment grievances. (*See id.* at 8, 11.) If so, the claim against Assistant Superintendent Bullard fails for the reasons previously discussed herein.

[7] In *Pearson*, the Supreme Court overruled the mandatory two-step sequence adopted in *Saucier v. Katz*, 533 U.S. 194 (2001), in analyzing qualified immunity. Thus, after *Pearson*, courts are free "to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances . . . ." *Pearson*, 555 U.S. at 236.

17

Here, Plaintiff has not demonstrated a constitutional violation. Thus, Defendants are entitled to qualified immunity. *See Abney v. Coe,* 493 F.3d 412, 415 (4th Cir. 2007) (finding that "[i]f [an official] did not violate any right, he is hardly in need of any immunity and the analysis ends right then and there"); *Parker v. Burris,* 2015 WL 1474909, at *8 (M.D.N.C. Mar. 31, 2015) (finding that "the absence of evidence supporting a finding that a constitutional violation occurred satisfies the first prong of the qualified immunity analysis"), *report and recommendation adopted*, No. 1:13CV488, 2015 WL 2169148 (M.D.N.C. May 8, 2015), *aff'd*, 623 F. App'x 82 (4th Cir. 2015).

In conclusion, summary judgment should be granted in favor of Defendants as none of their actions or inactions in this matter rise to a level of a constitutional violation. Plaintiff alleged several instances where others witnessed the actions of Defendants, however, beyond his own self-serving affidavit (*see* Docket Entry 86-1), Plaintiff's "mere rote assertions" regarding his claims "remain unaccompanied by supporting facts." *Lockett v. Johnson*, No. 7-11-CV-00125, 2011 WL 3794008, at *5 (W.D. Va. Aug. 25, 2011) (unpublished). This is simply insufficient to create a genuine issue of material fact here. *Larken v. Perkins*, 22 F. App'x 114, 115 n.1 (4th Cir. 2001) (unpublished) ("[Plaintiff] filed only his own, self-serving affidavit containing conclusory assertions and unsubstantiated speculation, which the district court properly found to be insufficient to stave off summary judgment."). As such, Defendants' motion should be granted.

## **CONCLUSION**

For the reasons stated herein, **IT IS HEREBY RECOMMENDED** that Defendants Patricia Anderson, William Bullard, Shannon Maples, Katy Poole and George S. Warren's

Motion for Summary Judgment (Docket Entry 81) be **GRANTED** and this action be dismissed.

_____
Joe L. Webster
United States Magistrate Judge

July 13, 2020
Durham, North Carolina